Darold W. Killmer
Wyoming Bar N. 8-6643
Reid Allison*
Madison Schaefer*
KILLMER LANE, LLP
1543 Champa Street, Suite 400
Denver, CO 80202
PHONE (303) 571-1000; FAX (303) 571-1001
Email: dkillmer@killmerlane.com; rallison@killmerlane.com; mschaefer@killmerlane.com
*Motion for admission *pro hac vice* forthcoming.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

| | | |
|---|---|---|
| ESTATE OF KENNETH DURRAH,<br>by and through its personal representative<br>Joshua Durrah,<br><br>Plaintiff,<br><br>v.<br><br>CAMPBELL COUNTY, WYOMING,<br>SHERIFF SCOTT MATHENY,<br>in his official capacity, and<br>SERGEANT MARA DONATHON,<br>CORPORAL MARLENE SHARPE,<br>DEPUTY RYAN WELLS,<br>DEPUTY ROBERT SHIRLEY,<br>DEPUTY JONATHAN HERMAN,<br>DEPUTY STEPHANIE QUINONES,<br>DEPUTY SAMUEL BOYLES, and<br>DEPUTY MARA MADRID,<br>in their individual capacities,<br><br>Defendants. | ) | Civil Action No. ________________ |

**COMPLAINT AND JURY DEMAND**

Plaintiff, by and through counsel Darold Killmer, Madison Schaefer, and Reid Allison of KILLMER LANE, LLP, submit this Complaint and Jury Demand as follows:

## I. INTRODUCTION

1. During the early morning hours of December 1, 2022, in the Campbell County Detention Center ("CCDC") in Gillette, WY, Kenneth Durrah died as he sat strapped to a restraint chair, naked and alone in a holding cell, mere feet from the Campbell County Sheriff's detention personnel who ignored his desperate pleas for help and cries of pain as his final minutes slipped agonizingly away.

2. Half an hour earlier, these Campbell County deputies and sergeant had responded to an emergency medical situation not by providing the necessary care, but rather by subjecting Mr. Durrah to a lengthy and aggressive use of force, during which they held Mr. Durrah in the notoriously dangerous prone restraint position, forcing his face and chest into the ground while they wrenched his limbs behind his back. Numerous deputies and a sergeant piled on top of him as he lay prone—he weighed a mere 142 pounds—and crushed him with their bodyweight as he repeatedly told them that he could not breathe.

3. The deputies knew that Mr. Durrah had ingested a substantial quantity of methamphetamine immediately prior to using this overwhelming and dangerous force against him. After applying substantial force, the deputies strapped him tightly into a restraint chair, preventing his movement and ability to breathe adequately. The deputies and sergeant heard Mr. Durrah's repeated admissions that he had drugs in his system and was worried that he could overdose. They also heard him say numerous times that he could not breathe well given the very tight strap across his chest in the restraint chair.

4. Yet, despite their knowledge of and participation in these events, and the obvious, serious health risks that could and did result from the same, ***the Campbell County deputies did not call for medical assistance to examine or treat Mr. Durrah.***

5. Instead of summoning medical aid, the deputies left Mr. Durrah tightly strapped in the restraint chair for half an hour as he died. As a result of the strenuous prone restraint and Mr. Durrah's inability to sufficiently respirate during and after the initial restraint, when he was tightly strapped in the restraint chair, he could not clear the dangerous buildup of carbon dioxide and lactic acid in his system, causing his body to become acidotic and fatally chemically imbalanced.

6. In a massive institutional failure which evinces stunning disregard for its responsibility to ensure the health and safety of its detainees, the Campbell County Sheriff's Office did not staff *any* nurses or medical personnel of any sort during nights, so there were no medical personnel at the jail at all to evaluate or treat Mr. Durrah.

7. Kenneth Durrah was a beloved brother and father, and his family continues to grieve his loss and always will.






8. Defendants are liable for Mr. Durrah's death under the Fourth and Fourteenth Amendments to the United States Constitution based on their use of excessive force against him and their deliberate indifference to his obvious serious medical needs.

## II. JURISDICTION AND VENUE

9. This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331, and this case is brought pursuant to 42 U.S.C. § 1983. Jurisdiction supporting Plaintiffs' claims for attorney fees is conferred by 42 U.S.C. § 1988. This Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

10. Venue is proper in the District of Wyoming pursuant to 28 U.S.C. § 1391(b). All the events alleged herein occurred within the State of Wyoming.

## III. PARTIES

**<u>Plaintiff</u>**

11. At all times relevant to the subject matter of this litigation, the decedent, Kenneth Durrah, was a citizen of the United States of America and was residing in custody at the Campbell County Jail in Gillette, Wyoming. All of the events relevant to this action took place in this judicial district, at the Campbell County Jail. Joshua Durrah, Mr. Durrah's brother, is the duly-appointed personal representative of the Estate of Kenneth Durrah.

**<u>Defendants</u>**

12. Defendant Campbell County, Wyoming, is a municipality organized under the laws of the State of Wyoming and is a "person" subject to suit under 42 U.S.C. § 1983. The Campbell County Sheriff's Office ("CCSO") is a law enforcement agency that is part of Campbell County. Defendant Campbell County is responsible for the oversight, supervision,

discipline, and training of CCSO deputies including the other Defendants named in this lawsuit.

13. At all relevant times, Defendant Scott Matheny was a citizen of the United States and a resident of and domiciled in Wyoming and was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer and the elected Sheriff of Campbell County.

14. At all relevant times, Defendant Mara Donathon was a citizen of the United States and a resident of and domiciled in Wyoming and was acting within the scope of her official duties and employment and under color of state law in her capacity as a law enforcement officer employed as a Sergeant at the Campbell County Sheriff's Office.

15. At all relevant times, Defendant Marlene Sharpe was a citizen of the United States and a resident of and domiciled in Wyoming and was acting within the scope of her official duties and employment and under color of state law in her capacity as a law enforcement officer employed by the Campbell County Sheriff's Office.

16. At all relevant times, Defendant Ryan Wells was a citizen of the United States and a resident of and domiciled in Wyoming and was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed as a Deputy at the Campbell County Sheriff's Office.

17. At all relevant times, Defendant Robert Shirley was a citizen of the United States and a resident of and domiciled in Wyoming and was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed as a Deputy at the Campbell County Sheriff's Office.

18. At all relevant times, Defendant Jonathan Herman was a citizen of the United States and a resident of and domiciled in Wyoming and was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed as a Deputy at the Campbell County Sheriff's Office.

19. At all times relevant to the subject matter of this litigation, Defendant Stephanie Quinones was a citizen of the United States and a resident of and domiciled in Wyoming and was acting within the scope of her official duties and employment and under color of state law in her capacity as a law enforcement officer employed as a Deputy at the Campbell County Sheriff's Office.

20. At all times relevant to the subject matter of this litigation, Defendant Samuel Boyles was a citizen of the United States and a resident of and domiciled in Wyoming and was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed as a Deputy at the Campbell County Sheriff's Office.

21. At all times relevant to the subject matter of this litigation, Defendant Mara Madrid was a citizen of the United States and a resident of and domiciled in Wyoming and was acting within the scope of her official duties and employment and under color of state law in her capacity as a law enforcement officer employed as a Deputy at the Campbell County Sheriff's Office.

## IV. FACTUAL ALLEGATIONS

### Kenneth Durrah suffered an apparent medical episode in his cell at the Campbell County Detention Center

22. Kenneth Durrah was booked into the Campbell County Detention Center ("CCDC") on November 23, 2022.

23. At approximately 12:30 AM on December 1, 2022, Mr. Durrah separately spoke with Defendant Campbell County Sheriff's Office ("CCSO") Deputies Robert Shirley and Jonathan Herman to ask if he could be let out of his cell for fresh air. The deputies refused to let Mr. Durrah into the dayroom and left him in his cell.

24. Mr. Durrah explained to Deputy Herman that he was suffering from anxiety in part because his son had been reported missing in South Dakota.

25. At approximately 1:20 AM, other inmates housed on Mr. Durrah's cell block began flickering the lights in their cells on and off to attract the attention of deputies; inmates at CCDC are instructed to flash their lights at night if they need assistance.

26. The inmates began flickering their lights in response to Mr. Durrah's complaints that he needed medical attention.

27. Multiple inmates reported that Mr. Durrah yelled that he could not breathe, called for a "medic," and complained of a problem with his heart.

28. Defendant CCSO Deputy Robert Shirley responded to the cell block, where inmates pointed him toward Mr. Durrah's cell.

29. Defendant Shirley could hear Mr. Durrah banging on his cell door for help.

30. Defendant Shirley called for assistance, and Defendant CCSO Deputies Mara Madrid, Jonathan Herman, and Ryan Wells, along with Defendant CCSO Sergeant Mara Donathon, also responded to the area of Mr. Durrah's cell.

31. The deputies opened the cell door, and Mr. Durrah collapsed.

32. Mr. Durrah clutched at his chest and told the deputies that his "heart hurt."

33. Defendant Shirley observed that Mr. Durrah's fists were repeatedly clenching and his toes were repeatedly curling.

34. Defendant Shirley retrieved an automated external defibrillator (AED), and Defendant Madrid requested a blood pressure cuff which Defendant Wells retrieved.

35. The deputies determined that Mr. Durrah had an elevated heartrate and high blood pressure.

36. By the time of these events, Defendant Campbell County had previously made the profoundly dangerous decision not to schedule *any* nurses or other medical staff to work nights at CCDC, and no CCDC nurses or other medical staff were present at CCDC during the events recounted herein.

37. Defendant Campbell County knew with certainty that some CCDC inmates would suffer medical emergencies at night and thus made an affirmative and conscious decision from among various alternatives to place inmates at risk of receiving inadequate medical care at night by providing no nighttime medical staff.

38. Defendant Donathon instructed the deputies to take Mr. Durrah to the jail's booking area and called for paramedics to be summoned from outside the jail facility to evaluate Mr. Durrah in the absence of dedicated medical staff at CCDC.

39. Defendants Herman and Shirley walked Mr. Durrah to the booking area, each supporting Mr. Durrah by an arm as he walked.

40. Mr. Durrah was entirely cooperative with Defendants Herman and Shirley.

41. As he was taken to booking, Mr. Durrah coughed continuously and continued to clutch at his chest.

42. Mr. Durrah again told the deputies that his heart hurt, and that it was difficult for him to breathe.

43. As Mr. Durrah had advised CCDC medical staff during his medical intake screening, he had a history of asthma.

44. Defendant Deputy Stephanie Quinones, who was processing an incoming inmate in the booking area when Mr. Durrah arrived, later told investigators that Mr. Durrah was so out of breath that it looked like "he just ran five miles."

45. Mr. Durrah vomited in the booking area as he awaited medical assistance.

46. Campbell County Memorial Health Paramedic Tracy Gale and Emergency Medical Technician Anna Schurman (together, "the medical responders") responded to the detention facility and examined Mr. Durrah in the booking area.

47. Mr. Durrah advised the medical responders that he had a history of asthma in the presence of several of the Defendant CCSO deputies.

48. To help lower his heart rate, the medical responders asked Mr. Durrah to try and calm down so that he could breathe regularly, and Mr. Durrah complied.

49. The medical responders found that Mr. Durrah's blood pressure and heart rate were elevated, confirming the conclusion earlier reached by the jail detention staff.

50. Still, the medical responders cleared Mr. Durrah to remain in the jail.

51. The medical responders left the detention facility at 1:46 a.m.

**Defendants watched as Mr. Durrah ingested an unknown quantity of methamphetamine**

52. As a matter of consistent practice and policy, Defendant Campbell County did not staff its jail with *any* medical providers or other medical staff during the relevant timeframe, which was late evening and early morning hours. There was not so much as a nurse on duty to observe Mr. Durrah once the medical responders departed.

53. In the absence of any medical staff to care for Mr. Durrah, Defendant Donathon ordered that Mr. Durrah be placed in a holding cell in booking, Cell 5, to be monitored by deputies until jail nursing staff arrived for work the following morning.

54. Mr. Durrah continued to report that it was difficult for him to breathe, to at least Defendants Wells and Quinones, who were stationed in the booking area along with Defendant Donathon. He also repeatedly requested water.

55. At approximately 2:15 a.m., Defendant Wells and Defendant Quinones observed through a window in his cell door a small white object in Mr. Durrah's mouth.

56. Defendant Wells described the object as a square jeweler's-sized bag with a white substance inside.

57. As Defendant Wells watched, Mr. Durrah ripped open the bag with his hands and teeth and began to swallow the contents.

58. Defendant Wells believed Mr. Durrah had ingested an unknown amount of the bag's contents.

59. Defendant Wells reported that he believed the bag contained drugs, and Mr. Durrah had indicated to him that he had already swallowed some of the bag's contents.

60. Defendant Wells was correct; Mr. Durrah had swallowed a substantial amount of methamphetamine, right before Defendant Wells's eyes. Defendant Quinones also observed Mr. Durrah swallow the bag.

61. Common short-term effects of methamphetamine ingestion include increased activity and wakefulness, as well as increased heart rate and body temperature. Methamphetamine also can cause panic, confusion, hallucinations, and anxiety. Methamphetamine ingestion or overdose can also cause or contribute to severe metabolic acidosis. This dangerous chemical imbalance happens because the drug overstimulates the body, leading to low oxygen in tissues, severe muscle breakdown, and kidney stress.

62. Mr. Durrah would exhibit several of these symptoms over the course of the lengthy uses of force which the CCSO deputies would soon inflict upon him.

63. Defendant Wells called for the door to Mr. Durrah's cell to be opened.

64. As Defendant Wells waited for the door to open, Defendant Donathon, also aware that Mr. Durrah had ingested drugs, suggested that the deputies should get Narcan ready.

65. The fact that Defendant Donathon suggested the use of Narcan demonstrates that she was aware of the medical risks attendant to Mr. Durrah's ingestion of a dangerous quantity of drugs, and that this was a serious medical issue.

66. Despite their subjective awareness, none of the defendants administered Narcan or took any other action to mitigate the effects of a potential drug overdose.

67. Nor did the Defendants call for any medical help for Mr. Durrah, despite the obvious health risks to him.

68. Instead, when the cell door opened, Defendant Wells ran into the cell to initiate a violent, reckless, and patently excessive use of force against Mr. Durrah.

**Defendants used overwhelming force against Mr. Durrah in response to an obvious serious medical issue**

69. Upon entering the cell, Defendant Wells stuck his fingers into Mr. Durrah's mouth to try to remove the bag of drugs.

70. Defendant Quinones entered the cell immediately thereafter and also went hands-on with Mr. Durrah.

71. Terrified and confused, Mr. Durrah first huddled in a corner of the cell, then ran out the cell's open door into the jail's booking area.

72. The booking area is not a public or community area, and there were no non-Campbell County detention personnel present at the time.

73. Defendant Wells, who still had a hand on Mr. Durrah, tackled him violently to the concrete floor of the booking area.

**Defendants employed a prone restraint technique widely known to law enforcement to cause positional asphyxia and serious injury or death**

74. Defendant Wells ordered Mr. Durrah to roll over, and Mr. Durrah complied, turning onto his stomach in a prone position.

75. The deputies then continued a dangerous pattern of behavior that ran through the entirety of their uses of force—placing their knees on Mr. Durrah and leaning their body weight

onto him in as he lay in the prone position, pushing him to a state of extreme physical exertion while substantially impairing his ability to respirate.

76. It is well known in the policing and medical communities that it is dangerous (and often fatal) to force a restrained person – particularly one like Mr. Durrah who was already known to be in a compromised condition – into a prone position, and putting pressure on the restrained individual's back only exacerbates that danger.

77. Federal government law enforcement agencies and respected organizations including the Department of Justice, the Federal Bureau of Investigation, and the International Association of Chiefs of Police have warned police departments of the dangers of prone restraint—and have done so since at least the mid-1990s.

78. Specifically, prone restraint can cause positional asphyxia, inhibiting breathing as the chest is compressed by the pressure of the subject's body weight and the subject is unable to relieve the compression, leading to a compromised airway. Placing additional weight on the back—like the weight of officers—compounds this risk.

79. These risks are compounded even further when the subject of the use of force is already at a known diminished capacity, as was the case with Mr. Durrah.

80. Prone restraint creates an extreme risk of acidosis, a condition in which the body becomes dangerously and potentially fatally acidotic.

81. Acidosis occurs when intense physical exertion, such as a struggle with law enforcement, causes an excessive buildup of lactic acid and carbon dioxide, and the subject is unable to respirate sufficiently to "blow off" the excess carbon dioxide. This condition can be profoundly damaging and even fatal.

82. As such, inhibiting respiration through the prone position and additional pressure on the back can place a subject in a dangerous acidotic state in mere minutes.

83. Notably, the danger of acidosis is significantly heightened in individuals whose metabolisms are under additional stress from other factors, such as drug use or previously existing medical conditions like Mr. Durrah's asthma.

84. The substantial amount of methamphetamine that Defendants Wells and Quinones had observed Mr. Durrah ingest placed Mr. Durrah's metabolism under significant strain. Because of his known drug ingestion, he obviously needed medical help, rather than additional strain being forced upon him by the Defendants.

85. Defendants Wells and Donathon already knew that Mr. Durrah had exhibited an elevated blood pressure and heart rate, as measured by themselves and by the medical responders less than an hour earlier.

86. Importantly, the deputies could and should have physically controlled Mr. Durrah without use of this dangerous technique, as Mr. Durrah was a slight man weighing only 142 pounds; instead, over the course of the next several minutes, CCSO deputies placed as much pressure on Mr. Durrah's prone body as they could manage.

87. In the first instance, Defendant Wells placed his right knee on Mr. Durrah's upper left leg, while Defendant Quinones placed her left knee on Mr. Durrah's lower back, leaning her full body weight onto him.

88. Simultaneously, Defendant Quinones pinned Mr. Durrah's right hand to the floor with her own right hand, while Defendant Wells used both of his hands to secure Mr. Durrah's left arm behind his back.

89. At this stage, Mr. Durrah was effectively subdued, but defendant officers continued to apply substantial force to him.

90. Though she was directly observing and supervising this use of force, Defendant Sergeant Donathon did not direct her subordinates to stop placing pressure on Mr. Durrah's back or otherwise direct them to use safer techniques.

91. Instead, Defendant Donathon joined in, placing her right knee on Mr. Durrah's upper back and neck and leaning on him with her full body weight.

92. All of the Defendant law enforcement officers were observing the excessive force applied to Mr. Durrah, and despite a legal obligation to intervene to prevent application of excessive force on a suspect, each of these named defendants failed to intervene to terminate the constitutional violation.

93. Mr. Durrah struggled to breathe under the pressure exerted by the deputies, and cried out in a choppy, labored voice: "I can't breathe!"

94. Defendants Donathon, Quinones and Wells held Mr. Durrah in this position for approximately 20 seconds, while Mr. Durrah begged the deputies to stop.

95. Defendant Wells then reinitiated the use of force in earnest, clambering onto Mr. Durrah's back and wrapping a forearm around Mr. Durrah's neck.

96. Defendant Wells wrenched Mr. Durrah backward such that Mr. Durrah ended up face-up on top of Defendant Wells, who also laid face-up on the ground.

97. Mr. Durrah screamed in pain and terror as Defendant Wells applied pressure to Mr. Durrah's neck with his left forearm and covered Mr. Durrah's mouth with his right arm, further impairing his ability to breathe.

98. Defendant Quinones climbed on top of Mr. Durrah, placing further pressure on him as he struggled to breathe through Defendant Wells' hold on his neck.

99. Defendant Donathon stood and moved to Mr. Durrah's lower body. She drew her Orcutt Police Nunchaku (OPN, sometimes called nunchucks) pain compliance weapon and applied it to Mr. Durrah's right ankle, intentionally causing Mr. Durrah significant additional pain and distress.

100. Defendant Boyles arrived in the booking area and ran to join the overwhelming concerted use of force.

101. The deputies and sergeant then rolled Mr. Durrah onto his stomach again, in the prone position.

102. Mr. Durrah continued to cry out in pain and to tell the deputies and sergeant that he could not breathe and begged them to stop hurting him.

103. Defendant Wells placed both of his hands on Mr. Durrah's upper back, pressing downward with his full body weight.

104. Defendant Wells then placed his left knee violently onto Mr. Durrah's head, grinding it into the concrete floor.

105. Defendant Quinones moved onto Mr. Durrah's legs, holding them down with her body weight. Defendant Donathon continued to forcibly apply her OPN and otherwise assisted in forcibly pinning down Mr. Durrah's legs.

106. Defendant Boyles placed *both* of his knees on Mr. Durrah's back and held them there to place his bodyweight on Mr. Durrah.

107. The Defendants held Mr. Durrah in this exceedingly dangerous prone position, with both large deputies pressuring his back, neck and head, for approximately 1 minute and 10 seconds as they handcuffed Mr. Durrah behind his back.



*Mr. Durrah prone on the floor underneath deputies*

108. Defendant Shirley also arrived in the booking area during this period and took the place of Defendant Donathon to pin down Mr. Durrah's feet.

109. Throughout the great majority of this period, Mr. Durrah was immobile and compliant; at that point, it required no significant exertion by the deputies to hold him.

110. When one of the male deputies directed Mr. Durrah not to move his leg, Mr. Durrah complied and responded, "Yes sir."

111. During this period, Mr. Durrah begged the deputies to give him Narcan and stated, "Don't let me die," and "No overdose."

112. Mr. Durrah's statements made clear to deputies that Mr. Durrah had ingested a potentially dangerous amount of drugs, especially given that at least Defendants Quinones and Wells had also directly observed the ingestion, and Defendant Sgt. Donathan had called for Narcan.

113. Even so, Defendants ignored Mr. Durrah's statements and did not call for the emergency medical care he obviously needed.

114. Despite Mr. Durrah's exclamations of distress, pleas for help, and declining physical resistance, Defendants Wells and Boyles kept their knees and bodyweight firmly on his head, neck and back throughout the use of force.

115. It has been clearly established for over a decade that "putting substantial or significant pressure on a [person's] back while that [person] is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." *Walton v. Gomez*, 745 F.3d 405, 424 (10th Cir. 2014) (quoting *Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008)).

116. Mr. Durrah was subdued and incapacitated by that time, but the force continued.

117. Defendants handcuffed Mr. Durrah behind his back as they crushed him.

**Defendants carried Mr. Durrah to a booking cell and pinned him in a *second* dangerous prone position for five more minutes to remove his clothing**

118. Long-standing policing best practices dictate that a person subjected to prone restraint should be moved to a "recovery position" on their side or sitting up to remove the compressing force on their airway and allow them to respirate freely as soon as possible.[1]

[1] As early as 1993, over three decades ago, IACP directed police departments around the country that "when it is necessary to use the weight of several officers in order to subdue an individual for handcuffing, the arrestee should be freed from that weight as soon as possible in order to

119. Having secured Mr. Durrah's hands in handcuffs, Defendants Shirley, Wells, Boyles, and Quinones did not place Mr. Durrah in a recovery position, nor did they allow him any opportunity to physically recover.

120. Instead, under the supervision of Defendant Sergeant Donathon, Defendants Wells, Boyles, Shirley, and Quinones lifted Mr. Durrah up (still in the prone position with his back arching) and carried him into another holding cell in the booking area, Cell 15.

121. In Cell 15, instead of de-escalating their uses of force, they decided to cut all of Mr. Durrah's clothing off with scissors during a *second*, protracted use of force.

122. Upon placing Mr. Durrah down on the concrete floor in the cell in the prone position, handcuffed behind his back, Defendant Wells immediately placed both of his knees and his entire body weight on top of Mr. Durrah, with his right knee on Mr. Durrah's upper back and his left knee on Mr. Durrah's head and neck. Defendant Boyles followed suit, placing his left knee and significant body weight on Mr. Durrah's back.

123. As Defendants Boyles and Wells leaned their bodyweight on him, they crushed the far smaller Mr. Durrah, compressing his chest and compromising his airway and ability to respirate the already-substantial buildup of carbon dioxide in his body.

124. Defendants Quinones and Shirley crossed Mr. Durrah's legs and forced them up toward his back, effectively wrenching his body into the dangerous "hog-tie" position by placing increased pressure on his chest, further depriving him of breath.

---

allow him to breathe freely. In order to facilitate the individual's breathing, he should also be rolled onto his side or into a sitting position as soon as possible." IACP, Training Key No. 429, Custody Death Syndrome (1993). The Department of Justice offered an even more succinct directive in a 1995 Bulletin: "[A]s soon as the suspect is handcuffed, get him off his stomach."

125. When an individual has diminished capacity caused by the influence of controlled substances, and that diminished capacity is apparent to the officers at the time, the application of a "hog-tie" restraint is likely to result in significant risk to the individual's health or well-being. *Cruz v. City of Laramie*, 239 F.3d 1183, 1188 (10th Cir. 2001). In such circumstances, the individual's condition mandates the use of less restrictive means for physical restraint. *Id.*

126. Defendant Shirley leaned down onto Mr. Durrah's crossed legs before ultimately sitting directly on top of his crossed legs, maintaining the physiological equivalent of a "hog-tie" restraint.

127. In severe pain and rising panic, Mr. Durrah instinctively began to squirm beneath the CCSO deputies in a desperate bid to breathe.

128. In response, Defendants Boyles and Wells shifted to maintain their positions atop Mr. Durrah's head, neck, and back, continuing to compress his chest and to continue to substantially impair his ability to respirate.

129. Additionally, Defendant Quinones shifted to place her own knee back onto Mr. Durrah. Collectively, Defendants Quinones, Boyles, Wells and Shirley now exerted approximately 500-700 pounds of pressure on 142-lb Durrah *in bodyweight alone.*



*Kenneth Durrah, beneath 4 deputies in Cell 15*

130. Throughout the restraint, Mr. Durrah repeatedly informed the deputies that he was struggling to breathe and begged them to let up the pressure on his back.

131. By preventing Mr. Durrah from breathing freely, the deputies caused Mr. Durrah to naturally struggle as he sought oxygen, physically exerting his system even more and thus more quickly reaching a dangerously acidotic state.

132. Notably, Sergeant Donathon had stepped back from direct involvement in the use of force to supervise the use of force. Rather than intervening to stop this constitutionally excessive use of force on Mr. Durrah or ordering a de-escalation of the force since Mr. Durrah was obviously subdued, Donathan just watched.

133. Sergeant Donathon stood at the door of Cell 15 and directly observed Quinones, Boyles, Wells and Shirley placing excessive, dangerous pressure on Mr. Durrah, but did not

issue any order to the deputies to correct their positioning or otherwise reduce the pressure on Mr. Durrah, to allow him to breathe.

134. None of the defendants herein took any efforts to intervene to reduce or prevent the excessive force which was occurring before all of their eyes.

135. Approximately one minute after the use of force in Cell 15 began, Defendant Donathon decided that ***even more force*** was called for under these circumstances, and ***for an extended duration***, and that Mr. Durrah would be placed in a restraint chair, and she went to retrieve the chair.

136. The decision to place Mr. Durrah in a restraint chair wholly negated any conceivable justification for the continued use of force against him for the purpose of removing his clothing. But the aggressive force in Cell 15 continued unabated.

137. Campbell County officials, including at least Undersheriff Quentin Reynolds and Jail Captain Kevin Theis, later told media that the Defendants decided to remove Mr. Durrah's clothing in the interest of detecting potential contraband.

138. Defendant Herman, on the other hand, told investigators that he believed the deputies removed Mr. Durrah's clothing in order to prevent him from harming himself.

139. The restraint chair – a metal chair equipped with straps to firmly hold an inmate in place, unable to use their limbs – would have prevented Mr. Durrah from moving and would have prevented him from accessing any contraband. The restraint chair would also prevent Mr. Durrah from using his clothing to harm himself. There was no reasonably justifiable need to remove his clothing.

140. To accomplish a task with no legitimate penological objective, Defendants inflicted a lengthy, violent, arduous, and exhausting use of force on Mr. Durrah after he had already be subjected to an extended use of force and had been fully subdued. Defendants Quinones, Boyles, Wells and Shirley continued with their dangerous extended struggle and restraint of Mr. Durrah in Cell 15 to cut off his clothing, rather than moving him immediately to the restraint chair.

141. Mr. Durrah repeatedly cried out that he could not breathe; one of the Defendant deputies repeatedly shouted at Mr. Durrah to "Shut up" and that he didn't care about what Mr. Durrah had to say.

142. While the use of force continued, Defendant Madrid arrived and, along with Defendant Donathon, stood by watching with the restraint chair outside of Cell 15.

143. Finally, after over five additional minutes of constant, heavy pressure on Mr. Durrah's head, back, and torso, Defendants Quinones, Boyles, Wells and Shirley hoisted the naked, handcuffed Mr. Durrah into the restraint chair.

**Defendants moved Mr. Durrah to a restraint chair and excessively tightened the waist and chest straps to further punish Mr. Durrah**

144. Having just been subjected to two lengthy exhausting uses of force during which several hundred pounds' worth of Defendants crushed the breath out of him, Mr. Durrah's body was in desperate need of respiration.

145. This was not simply a matter of Mr. Durrah catching his breath, and indeed, the ability to breathe alone would not allow him to recover; he needed to respirate freely in order to expel the excess buildup of carbon dioxide in his system to avoid fatal acidosis.

146. Mr. Durrah offered no resistance at all as Defendants Wells, Quinones, Boyles, Shirley, Madrid, and Donathon worked to secure him **very** tightly in the restraint chair.

147. Nonetheless, Defendants Boyles and Quinones *continued* to use their knees to place bodyweight on Mr. Durrah even as they and the other deputies strapped him into the chair.

148. As the deputies worked to strap Mr. Durrah tightly into the chair, Defendant Madrid repeatedly performed a pain-compliance hold on his mandibular pressure point near his jaw, intentionally causing even more pain and placing even greater stress on his already overtaxed system. A mandibular angle hold is a law enforcement pain compliance technique that applies targeted pressure to the jawbone area just behind the earlobe to control a *resistant* subject. Given Mr. Durrah's lack of resistance and the presence of at least six deputies actively restraining him, Defendant Madrid's continued application of the pain compliance technique had no legitimate penological purpose.

149. The deputies finished tightly applying the straps of the restraint chair without incident, given Mr. Durrah's lack of resistance, leaving him naked and struggling to breathe in the chair.

150. Though Mr. Durrah was already entirely secured in the restraint chair and offering no resistance whatsoever, Defendants Shirley, Boyles and Wells aggressively and intentionally *over*tightened the straps across Mr. Durrah's chest and waist, with the obvious consequence of restricting Mr. Durrah's respiration.

151. Defendant Wells yanked hard on the straps until he physically could not make them any tighter. Defendant Shirley later told investigators that this was the tightest that he had ever seen the straps on the restraint chair.

152. Defendant Shirley did not take any action to reduce the excessive tightness of the straps that he had observed. None of the named defendants took any steps to reduce the excessive tightness of the straps or to improve Mr. Durrah's ability to breathe.

153. Throughout the *entirety* of the use of force, Mr. Durrah never attempted to strike or otherwise threaten any of the Defendants.

154. At 2:27 a.m., Defendant Boyles wheeled Mr. Durrah, who was grimacing in agony, into another holding cell (Cell 13) leaving the door open so that he could be seen and clearly heard by the deputies in the booking area.



*Mr. Durrah, after two uses of force, in Restraint Chair at Cell 13*

**Defendants left Mr. Durrah in the restraint chair until he became unresponsive, never to regain consciousness**

155. Mr. Durrah was totally helpless, trapped in place by the overtightened restraint chair, naked, and unable to respirate effectively. He was utterly reliant on the Defendants to provide or seek help for his obvious, serious, soon-to-be-fatal medical needs.

156. Though Defendants Wells, Quinones, Boyles, Shirley, Madrid, and Donathon had just subjected Mr. Durrah to two lengthy, strenuous uses of force in a dangerous prone position, believed Mr. Durrah to have swallowed an unknown amount of narcotics on the basis of their own direct observations, had strapped Mr. Durrah over-tightly into a restraint chair, heard Mr. Durrah's pleas for them to allow him to breathe, and had earlier that night observed and called for an emergency medical response to Mr. Durrah's elevated heart rate and blood pressure and complaints about breathing difficulties even prior to their use of force, none of the Defendants summoned emergency medical services or *any* medical provider to assess or treat him and ensure his safety.

157. Given their knowledge of the serious, life-threatening medical concerns, Defendants had a constitutional duty to obtain appropriate medical care for Mr. Durrah without delay.

158. Even so, by the time that Defendant Boyles wheeled Mr. Durrah into Cell 13 at 2:27 a.m., approximately 12 minutes had already passed – and multiple significant uses of force inflicted upon him – since Defendants Wells, Quinones and Donathon observed Mr. Durrah ingest an unknown amount of suspected narcotics, yet none of them made any effort to obtain medical help for Mr. Durrah to address the same.

159. There were no medical staff on duty at CCDC. This staffing decision to fail to have medical staff on duty or immediately available evinced Campbell County's deliberate indifference to the medical needs of any inmate who stayed at the jail overnight.

160. Instead of summoning EMS immediately as was obviously appropriate and necessary, the Defendants talked and laughed amongst themselves and ignored Mr. Durrah.

161. Defendant Wells told the other Defendants immediately after Mr. Durrah was placed in Cell 13 that he had seen Mr. Durrah earlier ingest suspected narcotics.

162. Mr. Durrah would remain in the restraint chair for approximately 36 minutes. From the outset of his time in the chair until his death, Mr. Durrah repeatedly attempted to tell the Defendants of his inability to breathe and his dire condition.

163. As Defendant Boyles wheeled him to Cell 13 at approximately 2:27 a.m., Mr. Durrah repeatedly told the deputies that the restraint chair was too tight and that he could not breathe; they ignored him.

164. Defendant Wells told Defendant Donathon that he believed this incident involving Mr. Durrah's ingestion of drugs was relevant to an ongoing investigation of inmates accessing methamphetamine in the jail, again evidencing his knowledge that the substance he had observed Mr. Durrah rip open with his teeth was likely methamphetamine.

165. Defendant Donathon immediately contacted dispatch to report on this potential connection to the ongoing investigation into drugs in the jail.

166. Though Defendant Donathon urgently contacted dispatch to serve the ongoing investigation, and was literally standing at the phone, *she did not make any effort to contact emergency medical services or anyone else to help Mr. Durrah.*

167. At 2:28 a.m., Defendant Madrid walked past Cell 13, and Mr. Durrah asked her to give him Narcan. Defendant Madrid ignored Mr. Durrah.

168. At 2:28 a.m., Mr. Durrah loudly called out, "I can't breathe. I'm dying. Help! It's too tight!" The Defendants ignored him.

169. As the Defendants continued to ignore Mr. Durrah's rapidly worsening condition, CCSO Corporal Marlene Sharpe arrived at CCDC.

170. At 2:30 a.m., Mr. Durrah loudly called out, "I'm dying. I'm OD'ing. I swear!" The Defendants remained deliberately indifferent and continued to ignore him.

171. From 2:32 to 2:34 a.m., Mr. Durrah repeatedly wailed loudly in obvious pain and distress, and called out, "My fuckin' heart!"

172. As Mr. Durrah cried out in pain and begged for help, Defendants Wells, Quinones and Donathon joked and laughed with Corporal Sharpe only a few feet away at the booking desk.

173. Corporal Sharpe told her subordinates that she had just heard about "the naked black guy trying to escape."

174. Defendant Wells put on a high false voice and mocked Mr. Durrah's pleas for medical help: "Give me Narcan!"

175. Defendant Quinones joined in on the act and mockingly caricatured Mr. Durrah's desperate explanations that he was struggling to breathe: "I can't breathe, I can't breathe."

176. Defendant Quinones repeatedly expressed her incorrect belief that if a person could talk, that person could adequately breathe – a dangerous and long-debunked myth that neither of her superiors, Sharpe and Donathon, nor anyone else, corrected her about.

177. Defendant Donathon proudly boasted of her use of the OPN on Mr. Durrah.

178. Defendants Wells and Quinones described how they had initiated their use of force after seeing the baggie of drugs in Mr. Durrah's mouth.

179. Corporal Sharpe would later tell investigators that upon learning of the uses of force against and drug ingestion by Mr. Durrah, she directed that Mr. Durrah be checked because she claimed she was concerned about his medical state.

180. In fact, Corporal Sharpe did not direct that Mr. Durrah be checked for nearly half an hour after she learned of the facts giving rise to her medical concern, after he had already become unresponsive.

181. Defendant Sharpe delayed medical care to Mr. Durrah despite her knowledge of his serious medical need, as well as hearing him plead for help and beg that he could not breathe.

182. As was true with every other Defendant, when Defendant Sharpe learned of his serious medical condition, she had a constitutional duty to get him the emergency medical care he obviously and desperately needed. Instead, she (like the other Defendants) was deliberately indifferent to Mr. Durrah's obvious and serious medical need.

183. Defendant Wells eventually approached Cell 13 and looked in on Mr. Durrah for a split-second, then walked away.

184. Defendant Wells took no action to address Mr. Durrah's repeated complaints of difficulty breathing and chest pain.

185. At 2:35 a.m., Defendant Wells mostly closed the door to Cell 13, leaving it open only a crack and diminishing the deputies' view of Mr. Durrah from the booking area. Defendant Wells apparently did so because he and the other Defendants did not want to continue to hear Mr. Durrah's loud cries for help.

186. At 2:36 a.m., Defendant Wells discussed the events surrounding Mr. Durrah with another CCSO employee and reiterated that he had observed Mr. Durrah ripping open the bag of drugs with his teeth.

187. During the same conversation, as the pair discussed where the baggie of drugs might have ended up during the use of force and whether more drugs may have been in the building, Defendant Wells informed the other CCSO employee that Mr. Durrah "said he still he had some of it in him."

188. Despite once again recounting the fact that Mr. Durrah had used his mouth to open the small bag, and despite the fact that Defendant Wells could not conclusively say how much of its contents Mr. Durrah had ingested, and further despite the fact that Mr. Durrah was pleading for his life in Cell 13 mere *feet* away from Defendant Wells during this conversation, Defendant Wells *still* took no action to obtain emergency medical care for Mr. Durrah.

189. At 2:38 a.m., Defendant Quinones received a phone call in the booking area from someone seeking information about the use of force against Mr. Durrah.

190. During the phone call, Defendant Quinones confirmed that she had seen the drugs in Mr. Durrah's mouth and that she had heard Mr. Durrah's pleas for help and warnings that he was potentially overdosing.

191. Defendant Quinones again stated that she believed Mr. Durrah was able to breathe because he was able to talk, and that she had told Mr. Durrah that he was "fine" on that basis.

192. At 2:44 a.m., Defendant Wells briefly looked through the Cell 13 window at Mr. Durrah, then walked away. He did not check whether Mr. Durrah was breathing, had a pulse, or otherwise showed signs of life.

193. Defendant Wells took no action to address the serious and obvious ongoing medical emergency Mr. Durrah was suffering.

194. At 2:51 a.m., Defendant Wells opened the door to Cell 13 and entered the cell to examine Mr. Durrah and the restraint chair.

195. By this time, Mr. Durrah was unresponsive.

196. Predictably, the combination of the lengthy, crushing uses of force and prone restraint, the unaddressed methamphetamine ingestion, and the impossibility of sufficient respiration in the overtightened restraint chair had overwhelmed Mr. Durrah's system, leaving him acidotic.

197. Though Mr. Durrah was unresponsive, and though Defendant Wells had directly observed Mr. Durrah ingesting suspected methamphetamine, and though Defendant Wells had personally participated in both uses of force against Mr. Durrah and in his placement in the restraint chair, he *still* took no action to address Mr. Durrah's obvious medical needs.

198. Instead, and inexplicably, Defendant Wells gave Defendant Donathon a thumbs-up and reported that Mr. Durrah was breathing.

199. Breathing does not reduce the toxic effects of methamphetamine.

200. Breathing does not imply that the breather is respirating sufficiently to clear carbon dioxide and lactic acid from their system and avoid acidosis.

201. In people with asthma, like Mr. Durrah, even the apparent mechanical signs of breathing such as the rising of the chest or the appearance of sucking in air do not signify sufficient air actually passing through the airway and into the lungs.

202. Corporal Sharpe observed Mr. Durrah in the restraint chair and asked Defendant Wells about Mr. Durrah's status; Defendant Wells advised her that Mr. Durrah was asleep.

203. Corporal Sharpe heard that Mr. Durrah had possibly ingested drugs and had been in an altercation and observed that Mr. Durrah's head was lolling back.

204. Corporal Sharpe directed Defendant Wells to check on Mr. Durrah.

205. At 3:01 a.m., Defendant Wells returned to Cell 13 and repeatedly called Mr. Durrah by his name to no response. He attempted to wake Mr. Durrah but could not. Mr. Durrah had not moved since before Defendant Wells "checked on" him at 2:51 a.m.

206. Finally, Defendant Wells told Defendant Donathon to call for an ambulance—approximately 46 minutes since Defendant Wells had first observed Mr. Durrah ingesting methamphetamine, and approximately 34 minutes after Mr. Durrah had been strapped very tightly into the restraint chair.

207. Defendant Herman observed both of the prone restraints of Mr. Durrah, his placement in the restraint chair, and his time in the restraint chair via security camera feeds.

208. Defendant Herman never took any action of any kind to intervene to prevent the dangerous, unconstitutional uses of force against Mr. Durrah.

209. Defendant Herman finally contacted 911 at Defendant Donathon's behest *after* the belated discovery that Mr. Durrah had fallen unconscious in the restraint chair—even though he had observed all of the plainly dangerous uses of force against him during the previous 46 minutes.

210. As Defendant Wells continued to unsuccessfully attempt to wake Mr. Durrah with a sternum rub, Corporal Sharpe entered the cell and used a flashlight to check his pupils.

211. Corporal Sharpe observed that Mr. Durrah's pupils were "fixed and dilated," and told Defendant Donathon to have the ambulance respond "Code 3," meaning an immediate lights-and-sirens response to a time-sensitive, life-threatening situation.

212. Defendant Wells called for an Automated External Defibrillator (AED) to be brought to the cell, and Defendant Shirley retrieved it.

213. Defendant Wells checked for a pulse and claimed that he found a slight pulse on Mr. Durrah's neck, but Corporal Sharpe could not find a pulse.

214. At Corporal Sharpe's direction, Defendants Wells, Boyles, and Shirley worked to remove Mr. Durrah from the restraint chair but were very slow in doing so; it took nearly three minutes after Defendant Wells found Mr. Durrah unresponsive for the deputies to get Mr. Durrah out of the chair, time during which Mr. Durrah did not breathe, had no pulse, and could not receive CPR or any other medical intervention.

215. Defendants Wells, Boyles, and Shirley performed CPR and applied the AED device to Mr. Durrah. However, Mr. Durrah never regained a pulse, and the AED device never advised delivery of a shock to resuscitate him.

216. Reflecting inadequate training from the Campbell County Sheriff's Office, Defendants Boyles and Shirley were plainly unfamiliar with CPR technique and required direction from Corporal Sharpe to perform CPR after initially bungling their own CPR efforts.

217. EMS responders arrived approximately eight minutes after Corporal Sharpe directed Defendant Donathon to have the ambulance respond Code 3—medical help for Mr. Durrah had always been only a few minutes away had the Defendants bothered to contact EMS when they first witnessed Mr. Durrah ingest the methamphetamine.

218. Medical personnel rushed Mr. Durrah to Campbell County Memorial Hospital by ambulance, where he was pronounced dead.

**Campbell County is municipally liable for its Defendant-Officers' violations of Mr. Durrah's clearly established Constitutional rights**

219. At all times relevant to the allegations in this Complaint, the Individual Defendants acted or failed to act under color of state law.

220. At all relevant times, the described conduct of Defendants Donathon, Wells, Shirley, Herman, Quinones, Boyles, Madrid, and Sharpe (collectively, the "Individual Defendants") was taken within the course and scope of their official duties and employment.

221. At all relevant times, Mr. Durrah was a pretrial detainee subject to the protections of the Fourth and Fourteenth Amendment to the United States Constitution.

222. Mr. Durrah had a clearly established right under the Fourth, Eighth, and Fourteenth Amendments to be free from excessive force and from deliberate indifference to his known serious medical needs and to receive adequate medical care while in custody of CCSO.

223. To the extent he was under any conviction, Mr. Durrah was also protected from deliberate indifference to his known serious medical needs and to be free from excessive force, by the Eighth Amendment to the United States Constitution.

224. Each Individual Defendant knew or should have known of these clearly established rights at the time of the events described herein.

225. Under the application of the specific facts and totality of circumstances as described herein, Defendants violated the clearly established constitutional rights of Mr. Durrah.

226. Mr. Durrah was in obvious and serious need of immediate medical care at least from the moment of his ingestion of methamphetamine in the CCDC booking area, which was

directly observed by at least Defendants Wells and Quinones and made known by them to Donathan and all other Individual Defendants. Individual Defendants failed to provide or call for such medical care and instead engaged in (and/or allowed others to engage in) excessive force to restrain and punish him for his involuntary presentation of symptoms of substance intoxication.

227. Even after personally engaging in (and thus being aware of) ***two*** lengthy, obviously dangerous prone restraints following their observation of Mr. Durrah ingesting methamphetamine, which constituted the unjustified infliction of excessive force, the Individual Defendants *still* failed to so much as contact medical personnel for assistance. Defendants again were deliberately indifferent to this urgent and serious need for medical care and treatment.

228. Defendants intentionally placed Mr. Durrah in the restraint chair and forcefully over-tightened it, creating an environment in which Mr. Durrah could not respirate sufficiently to recover from their crushing use of excessive force.

229. The force inflicted upon Mr. Durrah by the Defendants herein was significantly disproportionate to any legitimate law enforcement need.

230. At the time the force was used upon him, Mr. Durrah was suspected of, at worst, ingestion of an illegal drug, a minor crime at worst.

231. Mr. Durrah never threatened or posed a significant threat of injury or death to any of the defendants or anyone else. None of the officers nor any third party were at risk of injury from Mr. Durrah when the force was being used on him.

232. Mr. Durrah only momentarily tried to escape the deputies' efforts to apprehend him, but he was soon effectively subdued by multiple deputies and handcuffed. At that point,

there was no risk of escape or realistic risk that Mr. Durrah would harm any of the jail employees or anyone else.

233. Defendants ignored Mr. Durrah's numerous statements that he was in danger of overdosing from the methamphetamine, that he was unable to breathe, and that *he was dying* during their use of excessive force and during Mr. Durrah's time in the restraint chair.

234. The Individual Defendants made intentional decisions with respect to the conditions under which Mr. Durrah was confined. They deliberately and intentionally withheld the medical care that they directly observed that he needed.

235. Defendant Campbell County made the intentional policy decision to not employ *any* medical staff to work at the jail at the time of the initial medical incident involving Mr. Durrah, the use of force against Mr. Durrah, or the subsequent approximately 36 minutes that Mr. Durrah would be strapped into the restraint chair, and no medical personnel examined or otherwise assisted Mr. Durrah during those times. The decision to not have medical staff on duty was a moving force in the injuries to Mr. Durrah, including his death.

236. During his medical intake screening at CCDC, Mr. Durrah reported that he had asthma, a condition that caused him to be at significantly greater risk of death and injury from force that restricted his respiration, such as that applied by the Individual Defendants in this case.

237. Defendant Campbell County and every single one of its agents and employees including all of the other Defendants in this matter were aware that serious medical problems of detainees could and often do arise both during the day and at night.

238. However, it remained the intentional custom, policy and practice of Defendant Campbell County not to schedule any medical staff to work at CCDC at night.

239. Defendant Campbell County written policy directed employees that after placing an inmate in a restraint chair, "Nursing will be notified as soon as possible"—but, in the case of an incident that occurred at night, it elected not to staff its jail with any nurses to notify.

240. Despite the written policy clearly requiring notification of medical professionals in the event a restraint chair is used, the Individual Defendants also did not make any effort to obtain medical assistance for Mr. Durrah from outside the facility, though such assistance was a mere phone call away, meaning that Defendants collectively ensured there was no qualified medical personnel present who could evaluate or treat Mr. Durrah for his obvious serious medical needs.

241. Defendants' failure to comply with written policies requiring obtaining medical care for inmates under these circumstances demonstrates a failure to adequately train and supervise detention personnel on constitutionally and County required mandates in the event of a medical crisis as experienced by Mr. Durrah here.

242. Failure to discipline or retrain these employees despite multiple and serious violations of policies and constitutional requirements demonstrates deliberate indifference by Campbell County (and the Sheriff in his official capacity) to the constitutional rights of people detained in the jail, including Mr. Durrah.

243. These conditions put Mr. Durrah at a substantial risk—indeed, a practical inevitability—of suffering serious harm, and he did suffer such harm, causing his death. Campbell County Sheriff Office's policies, customs, and practices were the moving force causing Mr. Durrah to not receive appropriate and prompt medical care and treatment during his medical emergency causing his death.

244. The Individual Defendants failed to intervene and/or take reasonable available measures to abate the serious and obvious risk to Mr. Durrah. A reasonable and adequately trained officer in the circumstances would have appreciated the high degree of risk involved – making the consequences of the Individual Defendants' conduct foreseeable and obvious.

245. The Individual Defendants' conduct was objectively unreasonable. At all relevant times, each Individual Defendant knew of and disregarded the excessive and manifestly obvious risks associated with Mr. Durrah's potentially life-threatening ingestion of an unknown amount of narcotics and their own and/or their colleague's deployment of use of force techniques in response to such ingestion, broadly known to cause injury and death.

246. By not making any effort whatsoever to obtain medical evaluation and treatment for Mr. Durrah, the Individual Defendants caused Mr. Durrah's injuries and death.

247. Defendant Campbell County is liable for its deliberately indifferent policies, practices, habits, customs, and failures to adequately train and supervise their employees and contractors with respect to the serious medical needs of detainees like Mr. Durrah.

248. Defendant Campbell County is directly liable for its own deliberately indifferent policies, customs, training, supervision, and practices that were moving forces in Mr. Durrah's constitutional injury, and its role in setting policy regarding medical care and staffing at CCDC.

249. Defendant Campbell County's failures in training and supervision were so obvious that the failure to provide the same evinced deliberate indifference to the rights of the relevant public and a moving force in the complained of injuries and death of Mr. Durrah.

250. Defendant Campbell County, through policymakers and final delegated decision-makers, ratified its employees' and subordinates' unconstitutional conduct by approving their decisions and the basis for them.

251. The ratification of the conduct that caused the death of Mr. Durrah is not alleged as proof that this ratification itself "caused" his death. Rather, it evidences that the conduct that caused Mr. Durrah's death was engaged in pursuant to policy, custom, and practice of CCSO; had it been outside of policy, disciplinary/remedial action would have been taken, but it was not.

252. In fact, though CCSO policy required that CCSO conduct an administrative investigation of any force incident resulting in death, upon information and belief CCSO never conducted *any* investigation of Mr. Durrah's death, including the deadly use of force, the failure to obtain any medical assistance for Mr. Durrah despite his blindingly obvious medical needs, the failure to schedule even a single nurse or other medical provider during nights at CCDC, or any other aspect of the circumstances of Mr. Durrah's death.

253. As such, CCSO never made any effort whatsoever to determine whether the Individual Defendants had followed CCSO policy and training, or whether defective policy or training may have contributed Mr. Durrah's death.

254. CCSO's decision not to conduct any administrative investigation into the Individual Defendants' use of force is especially irresponsible in light of the fact that the Individual Defendants so clearly violated CCSO written policy, which states, "An officer will not intentionally place a person in a position which significantly restricts the person's ability to breath [sic]. To avoid this, place the person on his/her side; seated upright in a seat, etc. in accordance with department training."

255. CCSO written policy further warns that "Weight such as officers sitting or kneeling on a subject" can cause positional asphyxia, and further advises that drug intoxication – such as would result from the observed ingestion of narcotics – could also restrict a person's ability to combat respiratory deficiency.

256. Clearly, Defendant Campbell County was aware of the potentially fatal risks of deputies sitting or kneeling on a subject at the time of Mr. Durrah's death and was further aware that drug intoxication heightened those risks.

257. Campbell County and the Sheriff's Office inadequately trained its detention staff on the meaning and methods of compliance with policies ostensibly designed to protect detainees' safety and their constitutional rights.

258. Despite such policies, the Individual Defendants did intentionally and repeatedly place Mr. Durrah in a position which significantly restricted his ability to breathe and intentionally and repeatedly placed their weight on Mr. Durrah by kneeling on him. Rather than placing him upright or on his side after their initial use of force, they elected to *again* place him in a position that significantly restricted his ability to breathe and placed their body weight on Mr. Durrah rather than allow him to recover. And then they placed Mr. Durrah in the restraint chair, which exacerbated and extended the problem, until he died, never having contacted medical professionals as required by written policy.

259. As evidenced by the Individual Defendants' conduct in their uses of force against Mr. Durrah, Defendant Campbell County failed to train its deputies to correctly use force to mitigate the risks of positional asphyxia and acidosis and failed to ensure that its deputies were both aware of its written policies and following them.

260. Similarly, Defendant Campbell County failed to train its deputies to obtain medical assistance for a person who had ingested an unknown quantity of suspected narcotics – though indeed, little training should be required for any rational adult person, let alone jail deputy, to understand the danger thus posed and need for immediate medical intervention. The dangers inherent to a person who has ingested illegal drugs are obvious even to a layperson.

261. Defendant Campbell County's command staff and public-facing officials were quick to cover up their subordinates' misconduct rather than enforce their own policies or law, conduct the policy-mandated investigation of Mr. Durrah's death, or discipline or retrain any deputy for violations of policy, demonstrating that CCSO's written policies are ineffectual in practice without appropriate training or enforcement on their execution. They are little more than an attempt to evade liability for the county, not actual rules that govern the behavior of its employees.

262. Defendant Sheriff Matheney stated there was no formal review of the use of force, by CCSO, even though the agency typically reviews use of force incidents and CCSO policy requires an administrative investigation of a use of force resulting in death.

263. The Sheriff claimed that the lengthy investigation of the death for potential criminal charges by the Wyoming Division of Criminal Investigation ("WDCI") interfered with its ability to conduct its own investigation—yet, even once the WDCI had completed that investigation, CCSO *still* failed to conduct an administrative investigation for policy violations.

264. The WDCI's investigation only examined whether not a crime had been committed in Mr. Durrah's death and did not make any inquiries or determination as to whether Campbell County's protocols for use of force and medical emergencies had been followed or

were adequate to meet the County's constitutional obligations, or whether the detention officers' use of force and lack of appropriate medical response violated constitutional standards.

265. Despite CCSO's decision not to investigate Mr. Durrah's death, and thus not to evaluate the Individual Defendants' conduct for compliance with CCSO policy (or the Constitution) or obtain the facts of what had occurred to cause Mr. Durrah's death, CCSO command staff and public-facing officials endorsed the Individual Defendants' actions in the press, reflecting their acknowledgement and understanding that the Defendants' conduct was approved and consistent with Campbell County's training of such officers and *actual* policies, customs, and practices.

266. Defendant Sheriff Matheney told the press that he approved of the Individual Defendants' decisions throughout, further evidencing that such conduct was engaged in pursuant to Campbell County and CCSO custom, policy, and practice.

267. CCSO Captain Kevin Theis stated that he told jail workers they had handled the situation well and encouraged them to move forward in a positive way, further evidencing that such conduct was engaged in pursuant to Campbell County and CCSO custom, policy, and practice.

268. CCSO policy requires that when an officer's use of force causes death, "[T]he officer shall be placed on administrative leave after completing all internal investigation requirements, and until it is determined by a mental health professional that the police officer is ready to return to duty."

269. This policy, too, was ignored by the County. None of the Defendants were required to complete any internal investigation requirements, since no internal investigation was conducted.

270. None of the Individual Defendants were placed on administrative leave.

271. Jail Captain Theis told the press that he spoke to the Individual Defendants prior to their next shift and offered no critical feedback about their performance. Captain Thies said "[w]e didn't necessarily cover any rights or wrongs, we just kind of debriefed, talked about it, see where everybody's at, make sure that they're comfortable to go back on the floor, see if we needed to give some more time off or not."

272. Jail Captain Theis further told the press that the reason he did not review the incident of Mr. Durrah's death in substance with the Individual Defendants was to eliminate the risk of them making statements that would contradict what they had told WDCI during the criminal investigation: "We wanted to make sure they're keeping their statements true to the investigation and what they told them…By reviewing it, it may put different things in their minds. I wanted to make sure I didn't interfere with that."

273. In other words, Captain Theis wanted to assist the Individual Defendants in evading liability for Mr. Durrah's death by "keeping their stories straight" with WDCI, rather than to investigate to determine whether the Individual Defendants had acted appropriately and within policy in the events that caused Mr. Durrah's death.

274. Regarding the failure to call for an ambulance after Mr. Durrah ingested methamphetamine, was subjected to two dangerous uses of force, and was tightly strapped to a restraint chair, Jail Captain Theis admitted "We probably should have [called for an

ambulance],” but, nonetheless stated dismissively, “I can’t say I would have called them back either.”

275. CCSO Undersheriff Quentin Reynolds stated that CCSO staff have no way of determining when detainees ingested drugs or what amount of drugs they had consumed. Indeed, though at least Defendants Wells and Quinones directly *observed* Mr. Durrah consuming suspected narcotics, they did not know precisely what quantity or type he had consumed.

276. As such, they were confronted by a potentially (and actually) dangerous medical situation – an unknown amount of an unknown narcotic in Mr. Durrah’s system – yet this did not prompt them to obtain medical assistance for Mr. Durrah for assessment or treatment.

277. Captain Theis publicly excused this failure by blaming previous inmates unrelated to Mr. Durrah who he claims had deceived CCDC staff as to their level of intoxication: “We have people come in under the influence all of the time under varying capacities…We’re not sure why we didn’t call EMS again but we’re always used to seeing and dealing with people, and they put on big shows.” He provided no evidence to believe that Mr. Durrah had deceived anyone at the jail, ever.

278. Ratification of previous instances of deliberate indifference to serious medical needs was a causal factor in the subsequent deliberate indifference to medical needs that Mr. Durrah suffered, as the employees of Campbell County are *de facto* trained and taught that such conduct is acceptable and within policy when it happens and management takes no disciplinary and remedial action in response.

279. Campbell County Sheriff’s Office has thus created and fostered an environment and culture of indifference to inmates’ rights to be protected against the use of excessive force

and their right to not be subjected to deliberate indifference to their obvious, serious medical needs in times of medical crisis.

280. The evidence as described demonstrates that whatever Campbell County's *written* policies may have been, they were customarily ignored by CCDC deputies and command staff.

281. But for the above acts or omissions of Campbell County and the Sheriff's Office, Mr. Durrah would not have been subjected to a violation of his clearly established constitutional rights, and such a deprivation was a natural and foreseeable consequence of these Defendants' acts and omissions.

## V. STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### 14th Amendment – Deliberate Indifference to Medical Needs
### (Against all Defendants)

282. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

283. At all relevant times, Defendants acted under color of state law.

284. At all relevant times Mr. Durrah was under the custody and control of the Defendant Officers as an inmate incarcerated at the Campbell County Detention Center.

285. After the Defendant Officers saw Mr. Durrah ingest what they believed to be an illicit drug, the Defendant Officers did not offer or provide Mr. Durrah medical attention but instead took turns kneeling on Mr. Durrah's neck and back simultaneously pressing his chest and face into the ground and then placed him into a restraint chair.

286. Despite Mr. Durrah's clear and urgent medical condition, the Defendant Officers exhibited deliberate indifference to his serious medical condition by failing to provide him access to timely, adequate, and necessary medical care.

287. Mr. Durrah repeatedly requested medical attention, but his requests were ignored or dismissed by the Defendant Officers. The Defendant Officers failed to provide adequate medical care despite knowing that Mr. Durrah was in serious medical need.

288. Defendant Officers' actions—specifically their decision and actions to apply excessive force for extended periods of time and continually kneel on Mr. Durrah's neck and back while he screamed in pain and repeatedly stated that he could not breathe, and to strap him tightly in a restraint chair—demonstrate deliberate indifference to the serious medical needs of Mr. Durrah.

289. The failure of Defendant Officers to appropriately act in response to Mr. Durrah's medical needs caused him significant harm, including unnecessary pain, suffering, and ultimately death.

290. As described with particularity above, Campbell County is liable for its deliberately indifferent policies, practices, habits, customs, widespread usages, and failures to adequately train and supervise their employees and contractors with respect to the serious medical needs of detainees like Mr. Durrah.

291. Defendant Campbell County is directly liable for its own deliberately indifferent policies, customs, and practices that were moving forces in Mr. Durrah's constitutional injury, as well as its deliberately indifferent training and supervision of its guards, its own role in setting policy regarding medical care at CCDC, and for its own ongoing toleration and/or ratification of

the practice of deliberate indifference to detainees' known serious medical needs.

292. As described in detail above, Campbell County's deliberately indifferent policies, customs, practices, and/or failures to adequately train and/or supervise were moving forces in the violation of Mr. Durrah's constitutional rights.

293. Campbell County was on notice that its deliberate indifference would result and had resulted in a pattern of not providing desperately needed care to inmates with serious medical needs causing injury and death.

294. Campbell County's failures in training and supervision were so obvious that the failure to provide the same was deliberately indifferent to the rights of the relevant public and a foreseeable moving force in the complained of injuries and death of Mr. Durrah.

295. Campbell County, through policy makers and final delegated decision-makers, affirmed that the individual defendants' conduct was pursuant to Campbell County approved policy and training when it ratified their employees and subordinates unconstitutional conduct by approving their decisions and the basis for them, including ongoing toleration of the known widespread culture of ignoring inmates' serious and known medical conditions.

296. The ratification of the conduct that caused the death of Mr. Durrah is not alleged as proof that this ratification itself "caused" his death. Rather, it evidences that the conduct that caused Mr. Durrah's death was engaged in pursuant to policy, custom, and practice of Campbell County; had it been *outside* of policy, disciplinary or remedial action would have been taken.

297. Ratification of *previous* instances of deliberate indifference to medical needs, however, was a causal factor in the subsequent deliberate indifference to medical needs regarding Mr. Durrah, as the employees of Campbell County are trained and taught that such

conduct is acceptable and within policy when it happens and management takes no disciplinary and remedial action in response.

298. Therefore, Campbell County set in motion a series of events that they knew would cause a detainee like Mr. Durrah to be deprived of his constitutional right to adequate medical care for his known serious medical needs. But for the above acts or omissions of Campbell County, Mr. Durrah would not have been subjected to a violation of his constitutional rights, and such a deprivation was a foreseeable consequence of the County's acts and omissions.

299. Campbell County's policies, practices, habits, customs, widespread usages, and lack of adequate training and supervision that resulted in the failure to provide proper medical care to treat Mr. Durrah's known serious medical needs were not rationally related to a legitimate nonpunitive governmental or penological purpose or were excessive in relation to that purpose.

300. The herein described acts or omissions of each Defendant were the moving force and the legal and proximate cause of the violation of Mr. Durrah's constitutional right to receive adequate medical care for his known serious medical needs.

301. The herein described acts or omissions of Defendants were the moving force and the legal, direct, and proximate cause of Plaintiff Estate's injuries and losses, including but not limited to Mr. Durrah's death, the physical and mental pain Mr. Durrah suffered before and during his death, the loss of Mr. Durrah's constitutional rights, loss of enjoyment of life, and other compensatory and special damages.

302. The herein described acts and inactions were taken by the Individual Defendants in reckless and callous indifference to the federally protected rights of Mr. Durrah, and these Defendants engaged in these actions and omissions maliciously, intentionally, willfully, and/or

wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Mr. Durrah's constitutionally-protected rights.

303. The intentional actions or inactions of each Defendant as described herein intentionally deprived Mr. Durrah of his rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused other damages.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourth and Fourteenth Amendments – Excessive Force**
**(Against all Defendants but Defendant Sharpe)**

304. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

305. All Defendant Detention Officers sued under this claim, at all relevant times, were acting under the color of state law.

306. Each Defendant Detention Officer was at all relevant times acting within the course and scope of their official duties and employment.

307. At the time of Mr. Durrah's death, Mr. Durrah had a clearly established constitutional right under the Fourth and Fourteenth Amendments to the United States Constitution to be secure in his person from unreasonable seizure through excessive force.

308. Each Defendant Officer also had the clearly established constitutional duty to intervene to prevent fellow officers from using excessive force against Mr. Durrah.

309. Under the specific facts and totality of circumstances as described herein, the Defendant Officers violated the clearly established constitutional rights of Mr. Durrah.

310. Any reasonable law enforcement officer knew or should have known of these clearly established rights at the time of Mr. Durrah's death.

311. No Defendant Officer at any time had a legally valid basis to seize Mr. Durrah's person in the manner and with the level of force used under the circumstances present. The force was excessive in violation of the Constitution. Mr. Durrah had done nothing that would legally justify the amount and type of force used, he was obviously unarmed, and he did not try or threaten to harm anyone. Further, Mr. Durrah was in a secure space and significantly outnumbered – in both quantity and size – by the officers that surrounded him.

312. The Defendant Officers' actions and omissions were objectively unreasonable in light of the circumstances confronting them.

313. The Defendant Officers are liable for the use of excessive against Mr. Durrah based on their direct participation in using excessive force.

314. Each Defendant Officer is also liable for failing to intervene to prevent their fellow officers from using excessive force against Mr. Durrah.

315. The acts and omissions in which the Individual CCSO Defendants engaged were because of and pursuant to the custom, policy, training, standard operating procedure, and/or practice of Defendant Campbell County.

316. As alleged in detail above, Defendant Campbell County has a custom, policy, culture, and practice of encouraging, condoning, tolerating, and ratifying use of excessive force by CCSO officers. This is manifested through, among other things, Campbell County's grossly inadequate training, supervision, and discipline of CCSO officers relating to the use of force.

317. The need for additional and effective use of force policies, training, and/or supervision was obvious, and Defendant Campbell County exhibited deliberate indifference to the known and substantial risk of harm to Mr. Durrah and others by failing to create adequate use

of force policies and/or to adequately train and/or supervise CCSO officers in the use of force.

318. Defendant Campbell County's failure to create and implement adequate use of force policies and/or to adequately train and/or supervise CCSO officers in the use of force was substantially certain to cause CCSO officers at CCDC to violate the constitutional rights of detainees like Mr. Durrah to be free from excessive force, and these Defendants consciously or deliberately chose to disregard this risk in failing to change the use of force policies and/or adequately train and/or supervise CCSO officers in the use of force, or to enforce the written policies of the jail. These acts and/or omissions constituted a deliberate choice by the Supervisory Defendants and Defendant Campbell County among several alternatives to pursue a course of action regarding creating and implementing policies, training, and supervision in the area of use of force.

319. Defendant Campbell County set in motion a series of events that they knew would cause a detainee in a similar situation as Mr. Durrah to be deprived of his constitutional right to be free from excessive force.

320. But for the above acts or omissions of Campbell County, Mr. Durrah would not have been subjected to a violation of his constitutional rights, and such a deprivation was a foreseeable consequence of these Defendants' acts and omissions.

321. The herein described acts or omissions of Defendant Campbell County and the Individual Defendants were the legal, direct, and proximate cause of Plaintiff Estate's injuries and losses, including but not limited to Mr. Durrah's death, the physical and mental pain and anguish Mr. Durrah suffered before and during his death, the loss of Mr. Durrah's constitutional rights, loss of enjoyment of life, and other compensatory and special damages.

322. The herein described acts and inactions were taken by the Individual Defendants in reckless and callous indifference to the federally protected rights of Mr. Durrah, and these Defendants engaged in these actions and omissions maliciously, intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Mr. Durrah's constitutionally protected rights.

323. The intentional actions or inactions of Defendant Campbell County and each Individual Defendants as described herein intentionally deprived Mr. Durrah of his rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment for the Plaintiff and against each of the Defendants, and award them all relief as allowed by law and equity, including, but not limited to the following:

(a) Declaratory relief and injunctive relief, as appropriate;

(b) Economic losses on all claims allowed by law in an amount to be determined at trial;

(c) Compensatory and consequential damages, including, but not limited to those for past and future losses, damages for emotional distress, loss of enjoyment of life, funeral and related expenses, hedonic damages for the lost value of relationships due to the death of Mr. Durrah, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(d) Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(e) Attorneys' fees and costs associated with this action, including expert witness fees,

on all claims allowed by law;

(f) Pre- and post-judgment interest at the highest lawful rate; and

(g) Any further relief as justice requires and that this Court deems just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 31st day of August 2026.

KILLMER LANE, LLP

*s/ Darold W. Killmer*

Darold Killmer (WSB #8-6643)
Reid Allison*
Madison Schaefer*
1543 Champa Street, Suite 400
Denver, Colorado 80202
(303) 571-1000
(303) 571-1001 fax
dkillmer@killmerlane.com
rallison@killmerlane.com
mschaefer@killmerlane.com
*Motion for admission *pro hac vice* forthcoming
*Attorneys for Plaintiff*